Good morning, Your Honors. If it pleases the Court, Gaurish Srin, on behalf of Martinis Suthandar, the following specific facts in this fact sequence are not in dispute. You don't have your handkerchief in your pocket. I apologize, Your Honor. Okay. Concerning Petitioner Martinis Suthandar's ethnic Chinese, and there is no dispute he is an ethnic Chinese, and there is no dispute he is a follower of the Christian faith in Indonesia. Let me just ask you the question. Your opposing counsel submitted a 28-J letter citing the Halem v. Holder. Doesn't that case control here? That is a red herring, Your Honor. That has nothing to do with this case. That is dealing with a person who was found to embellish, found there was an adverse credibility finding of Mr. Halem. Mr. Halem never, ever had any death threats made to him. He never had any close encounters based on his religion. He had no vicious beatings. He had nobody try to kill him, drag him out of his car while he was a Christian, threatening to kill him. What he had was they stripped him on a high school field while he was playing volleyball. It has nothing to do with this case. The case over here is controlled more by Riri Tambalon, where the history of what happens to Christians and to ethnic Chinese in Indonesia during this time period is laid out. My client was specifically attacked in close encounters, threatened with death, and on a daily basis called a Chinese pig. What do we do with Fokkeri? I was a little surprised when I reread that case. In that case, the individual was beaten, reportedly beaten on a couple of occasions and threatened by a mob. It was somewhat close to the facts of this case, and yet the court determined that we weren't compelled to conclude that these experiences amounted to past persecution. So he was beaten by youths and robbed of his sandals and pocket money, and then he was beaten a second time. How do we distinguish Fokkeri from this case? I believe Fokkeri deals with withholding. I'm dealing with asylum. We have over here a disfavored group. There is no dispute that Chinese... But could you address the past persecution finding in Fokkeri? Because the conclusion was it doesn't... We're compelled to conclude... We're not compelled to conclude that these experiences without more amount to past persecution. I can only talk about my facts. In my case, my facts are much different from Fokkeri. They are somewhat similar. My client, going to church on a Sunday, dressed in his Christian clothes, was dragged out of the car, called a Chinese infidel, was taken by eight Islamic fundamentalists out of the car and told them, it's time to die. You don't have that in Fokkeri. He was told specifically, we're going to kill you. And they beat the hell out of him. Then they went to his store. They burnt his store. They beat him till he vomited blood and he thought he was going to die and he lost consciousness. In the first incident, the police came. They looked. They walked by. You don't have that in Fokkeri. You have over here instantaneous close encounters like in Fijian cases where you have death threats with close encounters. And the law of the circuit for the last 10, 15 years states any death threats in itself made with close encounters constitute past persecution. You don't have that in Fokkeri, but you have it in September. So you're saying that the distinction between Fokkeri and this case is that in this case there was a death threat? There were multiple death threats. There was a death threat made specifically to him as he was being dragged out of the car on the Sunday when he was going to church. You're talking about the 1995. That is correct. It's time to die and they drag you out of the car. The 8 to 10 individuals, Islamic fundamentalists, breaking his car, breaking his windshield, taking him out of the car. The police come by and move on. Do with them whatever you want. The Islamic fundamentalist basically is what they're telling you. And then the facts of what happens to Chinese, especially ethnic Chinese, during this period of time is very well stated by Judge Preggison in Rewry Tamblyn and the whole history of Chinese persecution in Indonesia by Islamic fundamentalists is laid out. So to discuss, I believe, your case, Judge Nelson, it's totally a red herring. That was a boy who was facing discrimination at high school. He was basically just fooled around, hazed in school. Nobody ever threatened him with death. The judge didn't even find him credible. And they just stripped him of his clothes while playing volleyball. There was another incident that also wasn't there. In my fact? In Halim. There were five incidents in Halim. The police accused him of having drugs in his vehicle. Nothing to do with his race. Nothing to do with his religion. And there was an adverse credibility finding. In Halim, there was no adverse credibility finding. Is that correct? Opposite in this situation. In Halim, there was adverse. In my situation, these facts are undisputed. These facts are undisputed. And besides showing past persecution, like in the Fijian case, like in any other Jewish case coming out of Russia and Korbelina, going back to this history, he's been called on a daily basis, which no court has analyzed over here, a Chinese pig. It's race-bashing, race-baiting on a daily basis. He's been told as he walks, you're a Chinese pig. What are you going to do about it? He has to live through this, and he has to deal with these ethnic slurs, and he knows he has no protection. So the court, the BIA, found no well-founded fear of future persecution, relying on Rulong and some of our other cases, which say, at present, there is not a per se rule that the Chinese Christian is facing a pattern of practice of persecution in Indonesia. So even if we agreed with you that there was evidence of past persecution, there's still the question about a well-founded fear of future persecution. How do you address the BIA's finding on that issue? Well, if you found past persecution, you understand you need an individualized, you can't just go by general statements. In fact, again, going back to the case that just came out on Rory Tamblyn, it shows a well-founded fear that during this period of time, from 2000 onwards, in Indonesia, the green light's been given to Islamic fundamentalists to go hunt, kill, maim ethnic Chinese. And it's a 10%... The judge who's speaking, you interrupted her. I apologize, Your Honor. Our decision in Lulong indicates that there isn't currently, I guess unless conditions have changed, and I didn't see that in the record, that there isn't currently a pattern of practice of persecution for ethnic Chinese in Indonesia. So there would have to be some more individualized showing. And did your client make that showing to show that there is an objective risk as to him personally, individually? I think we're having a misunderstanding of the law. I apologize, Your Honor. Once my client is shown past persecution, there's a general presumption of a well-founded fear of future persecution. The government has to show... Well, the judge was going to say something. I'm sorry. Okay. Yes. So the burden shifts to the government to show that there is not a well-founded fear of future persecution. Here, the BIA didn't expressly shift the burden to the government because it found that there was past persecution. But I'm wondering whether there was any evidence in the record that there is a well-founded fear of future persecution. I have one minute on that. The two things I want to address, and I'm sorry if I interrupted. Number one, the BIA never found past persecution. On page 00113, we state all the country condition reports from the New York Times to the U.S. Department of State showing how Al-Qaeda, how Jemaat Islami, how terrorists in Indonesia are going and becoming stronger, how the Islamic clerics in Indonesia had ties with bin Laden, how General Powell at that time, who was heading the Department of State, stated that the Indonesian military has to be more accountable in protecting its Chinese citizens, which it wasn't. All these objective documentation showed my client had at least a 10% chance or a probability or a possibility of being persecuted if he went back. And coupled with him being a disfavored group, I think the objective proof would show more than 50% that he would have faced persecution. Thank you very much. I have 15 seconds. I'd like to keep it. And I apologize once again. I apologize for not having a handkerchief also. No, that's an inside joke. Every time he comes here, he gets more and more flamboyant. This time he's kind of dressing down. Thank you, Judge Pregson, and Mr. Sorensen, good morning to you also. And may it please the Court, I'm Joseph Hardy again for the Attorney General. Substantial evidence supports the Board's finding that Mr. Sundar has not established past persecution and that he had not established a well-founded fear of future persecution. With respect to the persecution finding, Mr. Sundar only testified to two incidents that occurred to him specifically in, what, 28 years of his living there. A 1995 incident in which he was pulled out of his car and beaten by ethnic Indonesians and a 1999 robbery where people robbed a store. There is no, I know the IJ found that there's no evidence that that incident was on account of a protected ground. All we know is that there were ethnic Indonesians that had beaten him or robbed a store and robbed several other stores in that little strip there. And I'll say this briefly before moving on to the other ones. This Court has found in cases like Sale, Lolong, Walkery, and Halim, incidents in which these people faced much more, far more incidents of harassment did not constitute persecution. And Mr. Sundar, as I said, in 28 years there's no evidence that there's a concentrated effort to persecute him or deprive him of his rights. As this Court stated in Lolong and again in Walkery last year, to the extent that there's any disfavored group in that country, it is not a severe disfavored group and that moves on to be well-founded fear. It is not a what? That there is not, there's no evidence that ethnic Chinese Christians in Indonesia are a severe disfavored group. Severe? That it is not a severe disfavored group. If you look at Lolong. Well, they're beating him up all the time. Well, this Court has also said that in Halim. Come on. Before we move from the past persecution, you say in 28 years, but the church incident occurred in 95. Then also in 95 there was a bomb explosion at his church just after he left it. And then in 99, so we're really talking about four years, there was the beating at his fruit shop, the robbery and beating at his fruit shop. And his statements, which we take as true, is that they were based on him being Chinese and being Christian. So I'm sort of troubled by this cluster of incidents within four years targeted at his identity as a Chinese person and a Christian. Why doesn't that meet our standard for persecution? I mean, this Court, as I've said, and all the other cases that have dealt, and I'll just stick with the cases that involve Indonesia.  All of those people faced many more incidents over a lifetime. Also involved in beatings. We said there in that sale case we held that Chinese Indonesians are a disfavored group in Indonesia and requiring only a comparatively low level of individualized risk. He had quite a bit of individualized risk. A car and going into a store and the bombing that took place. If you look at all of the other cases, one, there are only two incidents that happened to this man specifically. Well, that's enough, isn't it? No, it is not. How many times do they have to threaten his life to get after him? The evidence shows that they knew he was a Christian. And I think, and maybe I'm wrong on this, when they robbed his store they used some ethnic slurs, didn't they? In Lelong and in Wakar. Didn't they? I'm sorry? Didn't they? Yes. All right, then I want you to say yes when I ask that question. And I was going to say that that's the same thing that has happened in every single one of the cases involving ethnic Chinese Christians in Indonesia. In each of these cases. Well, that's serious when people are treated that way. And this Court has also stated in Lelong, your en banc decision, that it is not severe, that they are not a severe disfavored group in that country. Let me ask about Lelong. Okay. The petitioner in the Lelong case, as I understand it, made no argument that she feared being individually targeted for persecution. Hasn't Mr. Satanu done just that? Actually, if you look at the Board's decision, the Board points out... Well, didn't he do just that? I'm sorry? Didn't he do just that? He's asserted that, I would suggest that he hasn't. He said that these two things happened to me in my past. It also includes the incident where the church was emptied out when the pastor told them all to leave the church. And if you look at the... But didn't Lelong involve general undifferentiated claims? And I would say that this is the same, or at least with respect to the church bombing and the 1999 incident, he said that in 1999 when the fruit stand was robbed, the fruit stand was in sort of a strip mall, and everyone in that fruit stand or in that strip mall, their stores were also robbed and they were beaten. So it is a generally undifferentiated... Who did they rob? I'm sorry? What kind of people did they rob? He said that it was a store that also involved other ethnic Chinese Christians. That is not a joke. Did they say anything when they were beating him up? They did not say anything. I know he said that they... What did he say they said? He said that they beat him up, and in all the incidents they called him a Chinese infidel. Actually, in that incident, there was no evidence that there were any death threats, quite honestly. If there were going to be death threats, there was no reason for them not to. They beat the hell out of him. They called him a Chinese infidel. What else do you want? They also beat up all the other people in the strip mall, so it's undifferentiated. Oh, it's not undifferentiated. They beat him up, and they beat up a couple other Chinese people because of their religious beliefs. They were Christians. So how is that undifferentiated? They broke Auntie Sal's car. They beat her up. They tried to break into her boarding home. Lo Long, same thing. Over his lifetime, she had been beaten up. Excuse me. He had been beaten up. His cousins had been beaten up. A cousin had been raped, I think. I recall it was a testimony. Wakari, he was a pastor. He had been beaten up. Halim, he was stripped naked. He was teased as a child. In 1998, he was beaten up. He went to a doctor's appointment. They wouldn't treat him because he was an ethnic Chinese Christian. All of these incidents, I mean, this man has never said, look, there's nothing here that suggests that these people want to go after him in the future. Wakari was a pastor. Kotiles was the first case in 1994. That person was a priest. I think in Hopsia, the man had failed to respond. So he's supposed to be over there and feel very comfortable, you know, after they take him out of his car and beat the hell out of him and the police watch and do nothing and they call him all kinds of bad names because of his ethnicity and his religion and the same thing happens when they get into his fruit store and his church and all that. And that's, you know, I'm sure it's a comfort to him to know it's undifferentiated, you know. I mean, these things have happened. They're general things that happen to all, to many of the ethnic Chinese Christians in the country. You have to produce, you have to adduce. The burden of proof has two components, correct? There's the burden of production. There's the burden of persuasion. You need to establish, you need to submit or adduce evidences. Wakari used the word adduce a lot to say that, look, there's enough evidence of an individualized risk against me. People, I'm sorry. Let me just ask you this. If we should disagree with you and decide that the BIA was wrong in saying there wasn't sufficient evidence of past persecution, do we then have to remand because the BIA and the IJ erroneously didn't shift the burden of well-founded fear to the government? I'm sorry. I think you meant to say that there was no past persecution. Right. If you find that the board erred in finding no past persecution, then yes, you need to remand to the board, and the board needs to remand to the immigration judge for there to be a finding on whether there is past persecution. At that point, then the government would have to establish by preponderance of the evidence that it's not well-founded at that point. I do have 46 seconds left, so I will say that as far as the individualized risk and all of the, as I mentioned, in Kotaz, the gentleman was a priest. Bukhari, the gentleman was a pastor. I think Hoxha was the person who fell to respond to a summons in Albania also, or excuse me, in the Kosovo section of Serbia. Hemry was the non-Kuwaiti. She was a woman, and she was a Palestinian. Singh was the person from Fiji. He was the only manager at a dockyard. And all of the, the court specifically stated in all those countries, if the person has a special role or if they present so much evidence to suggest that there is an individualized risk against them, then only two things that this gentleman has presented. Don't establish that these people would be interested in him to persecute him in the future. There's no suggestion that anything more is going to arise than what has already happened. Is it just harassment? It's a lifetime of verbal harassment and intimidation. That does not rise to the level of past persecution, and it does not give rise to a well-founded fear of future persecution. Well, I hate to see somebody from the Justice Department make a statement like that. You know, come on. People get beaten up, or they get racial slurs, or they get robbed, or their churches are blown up, and the Justice Department doesn't think that's persecution? I think our President and our Attorney General take that very seriously. And to the extent that there is any suggestion that we don't, I'd point out that the court... No, no. I mean, I just can't believe it. I would point out that the court has also agreed with an en banc decision in Wakari last year, and I'm sorry, I won't say Wakari because that case has remained... Well, that en banc decision just talks about, you know, I use that word, undifferentiated claims. In other words, they say, well, there's a lot of bad stuff going around, and a certain amount of hatred, and all that. So, that's all right. And no longer there was... That's all right. And just so you don't get hit on the head, don't complain. But, you know, I hope the Supreme Court takes that case and does something with it, but I don't have much faith in that either. This court has also found... What? This court has also found, as recently as December 2009, in a low-long decision, in both cases, there were incidents of beating. I think we agree on that one. And it was more in low-long than in outlying. There were lifelong incidents of these people being harassed, beaten, amongst other things. And this court has agreed that, one, that they're not a severe disfavored group, and that incident is very similar... Who are you talking about? I'm sorry? What people are you talking about? Ethnic Chinese Christians in Indonesia. We're talking about low-long, we're talking about Wakari, we're talking about Sal, we're talking about Halim. I missed something there. I apologize, Jim. And I see that I'm over my time again, so unless there are any questions, I'll be seated. We have had a case applying disfavored group analysis to withholding a removal claim suggesting that Chinese Christian Indonesians are a disfavored group. And we have another one holding that Chinese Indonesians are a disfavored group. That's another one of mine. Are these published decisions? Yeah. Here, I'll give you a citation. 610 Feds 3rd, 1056, 558 Feds 3rd. 558 is Wakari, I think, right? Yeah, Wakari. I don't want to hold up your time. Yeah, I'm sorry. We got a lot of them. I don't doubt that they are. I'm not sitting here saying that they're not a disfavored group. The problem is, as the board has found, that he just didn't induce any individualized evidence that he faces a risk in the future. That's the only thing I'm saying. Well, it's a presumption. Well, that goes to past persecution. That doesn't go to the disfavored, as the court stated in Wakari. But he suffered past persecution. Well, we are arguing that he has not suffered past persecution. It's evidence that's very much like Lalonde, Sale, Wakari, Haleem. Incidents that this court have found do not rise to the level of persecution. Now, I'm saying that this court. I'm not saying the board. I'm saying this court. Many judges have found that those incidents do not rise to the level of persecution. Yeah, well, we don't agree 100% in everything. You know? Well, unless the court has any questions, I'd ask that you deny the petition for review. Why don't you get the Justice Department to get some of the people that President Obama has nominated through? And that would be a big help. You know, it's really a disgrace what's going on. The first time I went before the Senate in 67, from the time of my hearing until the time I had my commission in my hand. You know how many hours went by? Four hours. Four hours. You know, the second time I went in 79. And there was a little tension that went on over there. But I got mine within, I think, two weeks. The mails were slow. Now, we have some judges on this court that were kept cool in their heels for three or four years. You know about all that, don't you? No, I stay away from that. Well, you know, come on. It's nice being a trial attorney. You don't have to worry about all of it. You have to worry about everything. You know, we all live in this country. You've got to worry about what's going on. And, you know, eternal vigilance is the price of liberty. You've heard that, haven't you? I have. Okay. And so we've all got to be involved. And right now, everything's at a big stalemate. And it's, you know, I'd like to see some little compassion come out of the Justice Department once in a while. It's there, but sometimes not easy. I mean, I'll just say this before finally sitting down. I mean, these cases are difficult cases. It's better now. Okay, that's fine. Yeah, I mean, I know Dan Osuna. It's better now, you know. But it's got to get better. May I have your seat? Yeah, sure. Thank you. Thanks a lot. All right. Your time's up. We'll take the next matter. Beltran versus Astro. Well, that's submitted. Okay. Epigen ran a spanned off-label marketing and sales practices litigation. United Food and Commercial Workers, Central Pennsylvania Regional Health and Welfare Fund, and others. Versus Govita, Inc.
judges: Pregerson, Nelson D. W., Ikuta